1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  TINA MARTINEZ,                ) Case No. CV 16-7701-JPR
                                  )
12                Plaintiff,      )
                                  ) **MEMORANDUM DECISION AND ORDER**
13          v.                    ) **REVERSING COMMISSIONER**
                                  )
14  NANCY A. BERRYHILL, Acting    )
    Commissioner of Social        )
15  Security,[1]                  )
                                  )
16                Defendant.      )
                                  )
17  ─────────────────────────────

18  **I.    PROCEEDINGS**

19          Plaintiff seeks review of the Commissioner's final decision

20  denying her application for supplemental security income benefits

21  ("SSI").  The parties consented to the jurisdiction of a U.S.

22  Magistrate Judge under 28 U.S.C. § 636(c).  The matter is before

23  the Court on the parties' Joint Stipulation, filed May 25, 2017,

24  which the Court has taken under submission without oral argument.

25  For the reasons stated below, the Commissioner's decision is

26

27  ─────────────────

28          [1] Nancy A. Berryhill is substituted in as the correct
    Defendant.

                                  1

reversed and this action is remanded for further proceedings.

**II. BACKGROUND**

Plaintiff was born in 1978. (Administrative Record ("AR") 146.) She attended school at least until high school[2] and worked briefly in clothing and shoe stores. (AR 85, 90, 167, 226.)

On November 9, 2012, Plaintiff filed an application for SSI, alleging that she had been unable to work since January 1, 2005 (AR 70, 146), because of severe back and leg pain, muscle spasms, nerve problems, depression, and stage-three precancer in the cervix (AR 70). After her application was denied initially (AR 93-97) and on reconsideration (AR 98-104), she requested a hearing before an Administrative Law Judge (AR 105). A hearing was held on October 27, 2014, at which Plaintiff testified, as did a vocational expert. (AR 37-69.) In a written decision issued February 26, 2015, the ALJ found Plaintiff not disabled. (AR 17-30.) Plaintiff requested review, which the Appeals Council denied on August 22, 2016. (AR 1-4.) This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra

---

[2] There is some discrepancy about whether Plaintiff attended school through eighth or 10th grade. (Compare AR 44-45 (Plaintiff testifying that highest grade she passed was eighth), with AR 85, 167 (showing that Plaintiff completed 10th grade).)

2

v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial
evidence means such evidence as a reasonable person might accept
as adequate to support a conclusion.  Richardson, 402 U.S. at
401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).
It is more than a scintilla but less than a preponderance.
Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec.
Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether
substantial evidence supports a finding, the reviewing court
"must review the administrative record as a whole, weighing both
the evidence that supports and the evidence that detracts from
the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715,
720 (9th Cir. 1998).  "If the evidence can reasonably support
either affirming or reversing," the reviewing court "may not
substitute its judgment" for the Commissioner's.  Id. at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social
Security benefits if they are unable to engage in any substantial
gainful activity owing to a physical or mental impairment that is
expected to result in death or has lasted, or is expected to
last, for a continuous period of at least 12 months.  42 U.S.C.
§ 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.
1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process to
assess whether a claimant is disabled.  20 C.F.R.
§ 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir.
1995) (as amended Apr. 9, 1996).  In the first step, the
Commissioner must determine whether the claimant is currently

3

engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. § 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, the claimant is not disabled and the claim must be denied. § 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. § 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[3] to perform her past work; if so, she is not disabled and the claim must be denied. § 416.920(a)(4)(iv). The claimant has the burden of proving she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie

---

[3] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

case of disability is established.  Id.  If that happens or if
the claimant has no past relevant work, the Commissioner then
bears the burden of establishing that the claimant is not
disabled because she can perform other substantial gainful work
available in the national economy.  § 416.920(a)(4)(v); Drouin,
966 F.2d at 1257.  That determination comprises the fifth and
final step in the sequential analysis.  § 416.920(a)(4)(v);
Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in
substantial gainful activity since November 9, 2012, the
application date.  (AR 19.)  At step two, he concluded that
Plaintiff had severe impairments of "fibromyalgia, rheumatoid
arthritis, headaches, tendonitis of the left wrist, left arm
tremor, peripheral neuropathy, degenerative changes in the lumbar
spine and disc herniation, lumbar and cervical radiculopathy,
cervical strain, tricompartmental osteoarthritis of the left
knee, hyperlipidemia, and obesity."  (Id.)  At step three, he
determined that Plaintiff's impairments did not meet or equal a
listing.  (AR 20.)

At step four, the ALJ found that Plaintiff had the RFC to
perform light work with the following limitations:

she can occasionally climb ramps and stairs, but never
climb ladders, ropes, and scaffolds; she can occasionally
balance, stoop, kneel, crouch, and crawl; she can
occasionally push/pull with the upper extremities; she
can use the bilateral upper extremities for frequent
handling and fingering; and she should avoid working

5

around unprotected heights.
(Id.)  Plaintiff had no past relevant work for the ALJ to
evaluate against this RFC.  (AR 24.)  Based on the VE's
testimony, he found that Plaintiff could perform jobs existing in
significant numbers in the national economy.  (AR 24-25.)
Accordingly, he found Plaintiff not disabled.  (AR 25.)

**V.  DISCUSSION**

     Plaintiff alleges that the ALJ erred by rejecting the
opinions of two of her treating physicians (J. Stip. at 32-34,
37-38) and in assessing her credibility (id. at 10-12, 16-20, 21-
25, 27-28, 29-30, 32).[4]  Because the ALJ erred as to one of the
doctors, the matter must be remanded for further analysis and
findings.

     A.   <u>The ALJ Erred in Rejecting Dr. Calleros's Opinion But</u>
          <u>Not Dr. Romano's</u>

     Plaintiff contends that the ALJ did not cite "substantial
evidence allowing [the ALJ] to reject" the opinions of treating
physicians Gustavo Calleros and Thomas Romano.  (J. Stip. at 34.)

---

[4] Plaintiff's first five contentions (arguing that the ALJ
erred by "basing his adverse credibility determinations on
intentional mischaracterization and/or omission of relevant
evidence" (J. Stip. at 10); "making credibility judgments based
on his own opinions as a layperson as to Plaintiff's treatment"
(id. at 18); "improperly bas[ing] an adverse credibility
determination on Plaintiff's purported activities of daily
living" (id. at 22); "improperly bas[ing] an adverse credibility
determination on cherry picked references to 'improvement'" (id.
at 27); and "fail[ing] to show substantial evidence to support
ignoring Plaintiff's testimony as to her impairments" (id. at
30)) essentially boil down to a challenge to the ALJ's adverse
credibility finding, and the Court has discussed them as one.

### 1. <u>Applicable law</u>

Three types of physicians may offer opinions in Social Security cases: those who directly treated the plaintiff, those who examined but did not treat the plaintiff, and those who did neither. <u>Lester</u>, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's. <u>Id.</u>

This is true because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996). If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight. § 416.927(c)(2).[5] If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment

---

[5] Social Security regulations regarding the evaluation of opinion evidence were amended effective March 27, 2017. When, as here, the ALJ's decision is the final decision of the Commissioner, the reviewing court generally applies the law in effect at the time of the ALJ's decision. <u>See</u> <u>Lowry v. Astrue</u>, 474 F. App'x 801, 804 n.2 (2d Cir. 2012) (applying version of regulation in effect at time of ALJ's decision despite subsequent amendment); <u>Garrett ex rel. Moore v. Barnhart</u>, 366 F.3d 643, 647 (8th Cir. 2004) ("We apply the rules that were in effect at the time the Commissioner's decision became final."); <u>Spencer v. Colvin</u>, No. 3:15-CV-05925-DWC, 2016 WL 7046848, at *9 n.4 (W.D. Wash. Dec. 1, 2016) ("42 U.S.C. § 405 does not contain any express authorization from Congress allowing the Commissioner to engage in retroactive rulemaking"). Accordingly, citations to 20 C.F.R. § 416.927 are to the version in effect from August 24, 2012, to March 26, 2017.

relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors. § 416.927(c)(2)-(6).

When a physician's opinion is not contradicted by other evidence in the record, it may be rejected only for "clear and convincing" reasons. See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting Lester, 81 F.3d at 830-31). When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it. Id. (quoting Lester, 81 F.3d at 830-31). The weight given an examining physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things. § 416.927(c)(3)-(6). These factors also determine the weight afforded the opinions of nonexamining physicians. § 416.927(e).

The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See 42 U.S.C. § 405(g); Richardson, 402 U.S. at 401; Parra, 481 F.3d at 746. The ALJ must consider all the medical opinions "together with the rest of the relevant evidence." 20 C.F.R. § 416.927(b). If the "'evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

8

## 2. Relevant facts

Plaintiff began treatment with Dr. Calleros, her primary-care physician, on October 31, 2012. (AR 352-53.) She presented with hyperlipidemia, hyperglycemia, and back pain, claiming that she had experienced the back pain "on [and] off for [a] decade" and that her leg would "get . . . restless" in the evening. (AR 352.) On December 14, 2012, Dr. Calleros ordered a general diagnostic examination of Plaintiff's lumbar spine, which showed "curvature" but was "otherwise [a] normal study." (AR 450.) On February 6, 2013, Plaintiff saw Dr. Calleros for a pap smear related to her irregular menses. (AR 484-85.) Her physical exam was essentially "normal," though her pap smear found "atypical squamous cells of undetermined significance." (AR 485.) On March 6, 2013, Plaintiff reported back pain and "frequent" headaches. (AR 486.) Dr. Calleros's physical exam of Plaintiff revealed that her "[l]umbar spine has tenderness" and her deep tendon reflexes were "preserved and symmetric." (AR 487.) He prescribed Plaintiff Norco[6] and diclofenac,[7] ordered an MRI of her lumbar spine, and referred her to an orthopedic doctor. (Id.)

---

[6] Norco is an opioid pain medication used to relieve moderate to moderately severe pain. See Norco, Drugs.com, https://www.drugs.com/norco.html (last updated Sept. 29, 2016). It contains a combination of acetaminophen and hydrocodone. Id.

[7] Diclofenac is a nonsteroidal antiinflammatory drug that reduces substances in the body that cause pain and inflammation. See Diclofenac, Drugs.com, https://www.drugs.com/diclofenac.html (last updated Mar. 23, 2017). It is used to treat mild to moderate pain or signs and symptoms of osteoarthritis and rheumatoid arthritis. Id.

9

On June 12, 2013, Plaintiff reported arm pain at a "4/10" and a tremor on her left side "radiating up [her] arm." (AR 628-29.) She was "positive for [j]oint pain," and her musculoskeletal exam revealed "moderate pain [with] motion." (Id.) Dr. Calleros prescribed prednisone[8] for Plaintiff's "[p]ain in joint involving hand." (AR 629.) On August 22, 2013, Plaintiff reported that her left arm "still shakes," the prednisone provided only "mild help," and the Norco "gave [her] insomnia" and was "[n]ot helpful." (AR 630.) She still experienced back pain. (Id.) Dr. Calleros noted Plaintiff's "tremors," referred her to neurology for further assessment, and ordered x-rays of her "neck spine" and wrist. (AR 631.) He prescribed primidone[9] and gabapentin[10] for her tremor and Percocet[11] for her back pain. (Id.) On October 10, 2013, Plaintiff followed up with Dr. Calleros about her tremor and also complained of "upper neck muscle spasms." (AR 633.) Dr. Calleros noted that her wrist x-ray was "normal" and her neck

---

[8] Prednisone is a corticosteroid that prevents the release of substances in the body that cause inflammation. See Prednisone, Drugs.com, https://www.drugs.com/prednisone.html (last updated Feb. 13, 2013).

[9] Primidone is a barbiturate anticonvulsant used to control and reduce seizures. See Primidone, WebMD.com, http://www.webmd.com/drugs/2/drug-8696/primidone-oral/details (last visited Oct. 4, 2017).

[10] Gapapentin is an antiepileptic medication used to treat neuropathic pain. See Gabapentin, Drugs.com, https://www.drugs.com/gabapentin.html (last updated Nov. 9, 2015).

[11] Percocet is an opioid pain medication used to relieve moderate to severe pain. See Percocet, Drugs.com, https://www.drugs.com/percocet.html (last updated May 6, 2017).

showed "loss of cervical lordosis." (Id.)  He prescribed Norco
and Robaxin[12] for the muscle spasms in her neck.  (AR 634.)

On January 2, 2014, Plaintiff complained of headaches,
tremors, back pain, and joint pain.  (AR 636.)  On March 6, 2014,
she also reported knee pain and symptoms of carpal tunnel
syndrome, and Dr. Calleros ordered an x-ray of her knees.  (AR
643-45.)  The results showed an impression of "minimal
tricompartmental osteoarthritis."  (AR 546.)  On April 3, 2014,
Plaintiff experienced joint pain, joint swelling, numbness in her
extremities, abdominal distension, heartburn, and knee pain.  (AR
647.)  Dr. Calleros's physical exam showed "tenderness" in her
"[l]eft knee."  (AR 648.)

On June 12, 2014, Plaintiff complained of back and joint
pain.  (AR 650.)  Dr. Calleros's physical exam revealed
"tenderness" in her "[l]eft hand" and "wrist."  (AR 651.)  He
diagnosed her with "[w]rist tendonitis" and ordered followups
with "Ortho and Neuro."  (Id.)  He also prescribed physical
therapy and suggested she continue taking Norco for her back
pain.  (Id.)

On October 16, 2014, Dr. Calleros filled out a "Medical
Statement regarding pain for Social Security disability claim"
for Plaintiff.  (AR 670-71.)  He checked boxes indicating the
following were present: neuroanatomic distribution of pain,
limitation of motion of the spine, sensory or reflex loss,
positive straight-leg-raising test, severe burning or painful

---

[12] Robaxin is a muscle relaxant used with rest and physical
therapy to treat skeletal muscle pain.  See Robaxin, Drugs.com,
https://www.drugs.com/robaxin.html (last updated July 28, 2011).

dysesthesia,[13] need to change position more than once every two hours, and inability to ambulate effectively. (AR 670.) He opined that Plaintiff suffered from "severe" pain, could sit for one hour a day for 30 minutes at a time, and could stand or walk for one hour a day for 30 minutes at a time. (AR 671.) She could lift five pounds occasionally, no weight frequently, and could never bend or stoop. (Id.) She could frequently rotate her neck to the left and right, frequently elevate her chin, and occasionally bring her chin to her neck. (Id.)

Plaintiff first saw Dr. Luigi Galloni, an orthopedic surgeon referred by Dr. Calleros (see AR 623), on June 3, 2013 (AR 539-40). He noted that she was "referred for low back pain" "of over 17 years" that was "constant [but] vary[ing] in intensity." (AR 539.) His physical examination revealed "tenderness localized over the L4-L5 and mostly the L5-S1 facets, more on the left than on the right." (AR 540.) She had a "positive facet loading test," but her "[s]traight leg raising [was] negative" and her "[d]eep tendon reflexes and motor functions [were] intact." (Id.) His impression of her ailments was "Lumbar myoligamentous sprain/strain" and "Lumbar facet arthropathy," and he prescribed a "physical therapy program two to three times a week for two to three weeks for stretching and strengthening." (Id.) An MRI of

---

[13] Dysesthesia is caused by lesions of the peripheral or central sensory pathways and results in a disagreeable sensation produced by ordinary stimuli. Stedman's Medical Dictionary 551 (27th ed. 2000). This pain, often associated with multiple sclerosis, usually manifests in a burning, prickling, or aching feeling. See What Is Dysesthesia (Multiple Sclerosis Pain)?, http://www.webmd.com/multiple-sclerosis/dysesthesia-pain#1 (last updated Mar. 30, 2017).

her lumbar spine on July 26, 2013, showed "[d]egenerative disk disease" at the "L5-S1 level" and a "0.52-cm posterior bulging of the disk at the L5-S1 level which causes compression of the thecal sac anteriorly and narrowing of both the left and right sided neural foramina, worse on the left side." (AR 535-36.)

Dr. Galloni referred Plaintiff to Ryan Kishimoto, a physical therapist. (See AR 574-76, 580-81, 586-90, 603-06, 611-16). On July 3, 2013, at Plaintiff's first appointment with Kishimoto, she reported that her "pain makes it difficult to walk, sleep, and clean around the house" and that she "has help from [her] husband and daughter." (AR 611.) On August 8, 2013, she was "compliant with [the] home exercise program, but continue[d] to [complain of] low back pain." (AR 605.) She reported her "Pain In" as "8/10" and her "Pain Out" as "6/10." (AR 606.) On August 29, 2013, at the beginning of the appointment she "continue[d] to [complain of] low back pain," but after treatment she had "no [complaints of] pain in [the] low back [and she] stat[ed] that the pain meds she took [that] morning were helping"; her "Pain In" was "4/10" and her "Pain Out" was "1/10." (AR 603-04.) On September 4 and 30, 2013, she similarly had "increased low back pain" at the beginning of the session and after treatment "stated decreased pain in low back, increased mobility with flexion and sidebending," and was "able [to] perform activities of daily living and ambulate longer than 10 min with less pain." (AR 586-90.) In an October 7, 2013 appointment with Dr. Galloni, Plaintiff stated that she had "constant unrelenting pain in her lower back." (AR 541.) At an October 18, 2013 therapy session with Kishimoto, Plaintiff stated that she was "doing well,

[experiencing] less pain in low back." (AR 580.) Her "Pain In" was "4/10" and her "Pain Out" was "3/10." (AR 581.) Treatment notes from the visit show that at that point only a "home exercise program" was available to her "until [she] receive[d] more authorized visits" from insurance. (Id.)

On December 23, 2013, Dr. Galloni encouraged Plaintiff to schedule an appointment with a "pain management doctor for medications and epidurals as soon as possible." (AR 544.) He advised that "if conservative treatment fails she may need to be referred to a spine surgeon." (Id.) On March 20, 2014, Kishimoto "discharged Plaintiff from physical therapy due to failure to make scheduled appointments or failure to make any follow up appointments." (AR 575.) Her chart stated that she had been to five treatments and missed none. (AR 574.)

Dr. Jessica Meir, a neurologist, saw Plaintiff on October 23, 2013, and ordered MRIs of her cervical and lumbar spine. (AR 653-55.) On March 13, 2014, Dr. Meir assessed Plaintiff with peripheral neuropathy, lumbar radiculopathy, and cervical radiculopathy. (AR 656.) On March 14, 2014, the cervical-spine MRI results were essentially normal (AR 660), but the lumbar-spine MRI showed "[m]ild degenerative changes on the left side": "[d]esiccation of the disc matrices," "a 3 mm focal left posterolateral protrusion extending into the ipsilateral neural foramen[] underneath the exiting left L5 nerve root," and "mildly bulky" "facet complexes" (AR 661). On April 8, 2014, Dr. Meir noted that the "point tenderness" in Plaintiff's hands was "suspicious for tendonitis" and referred her to a rheumatologist. (AR 657-59.)

14

Plaintiff first saw Dr. Thomas Romano, a rheumatologist, on August 20, 2014. (AR 662.) Her "complaints include[d] joint stiffness, 'gelling' of joints after periods of inactivity, swelling, redness, warmth, crepitation, deformity and effusions." (Id.) Her symptoms were "progressive[ly] worsening." (Id.) Dr. Romano's objective musculoskeletal exam showed "normal gait; grossly normal tone and muscle strength; full, painless range of motion of all major muscle groups and joints[; and] no masses, effusions, misalignment, crepitus, or tenderness in major joints." (AR 665.) She exhibited no other symptoms of any kind. (See generally AR 662, 665.) He diagnosed her with joint pain in "multiple sites" and rheumatoid arthritis. (AR 665.) On October 2, 2014, Plaintiff presented with the same complaints and Dr. Romano's physical exam produced the same results. (AR 663-64.) He also diagnosed her with fibromyalgia. (AR 664.)

That same day, Dr. Romano filled out a check-box "Medical Statement regarding diabetes for Social Security disability claim" about Plaintiff's symptoms. (AR 666-69.) He checked boxes indicating the following were present: history of joint pain, history of joint swelling, history of joint tenderness, morning stiffness, synovial inflammation, limitation of motion in joints, radiographic changes typical of arthritis, inability to ambulate effectively, and inability to perform fine and gross movements effectively. (AR 666.) The joints of both hands, wrists, and ankles exhibited inflammation. (AR 667.) Her fatigue and malaise were "extreme," and her activities of daily living were "severely" limited. (AR 668.) He opined that she could sit for one hour a day, 30 minutes at a time; couldn't

15

stand or walk at all "per day" but could stand or walk for 15 minutes "at one time"; and could lift 10 pounds occasionally and five pounds frequently. (Id.) Finally, he found that she could "never" bend, stoop, finely or grossly manipulate either hand or raise either arm above shoulder level. (Id.)

On December 28, 2014, Dr. Thomas Keller saw Plaintiff for the orthopedic consultation ordered by the ALJ. (AR 62, 672-76.) She presented with "low back pain," "stat[ing] the pain is worse with bending forward or backward or extending her back"; she "has difficulty ambulating for prolonged periods of time," and "increase[d] activity causes increased pain." (AR 672.) She claimed that "physical therapy . . . has not helped at all." (Id.) Dr. Keller's lumbar-spine inspection revealed "significant tenderness to palpation," a range of motion limited to "30 degrees of forward flexion and 10 degrees of extension," and lateral bending "limited to 10 degrees either way." (AR 674.) Dr. Keller noted that Plaintiff "walked with a mildly shuffled gait," she "declined performing squat and stand," and she "was unable to perform a heel or toe stance without the use of a support from the examination table." (AR 673.) His inspection of her lower extremities showed "signs of sacroiliitis[14] in [Plaintiff's] left hip," and "[t]here was tenderness to palpation over the trochanteric bursa on the left side." (AR 674.) An x-

[14] Sacroiliitis is an inflammation of one or both sacroiliac joints — situated where the lower spine and pelvis connect. See Sacroiliitis, Mayo Clinic, http://www.mayoclinic.org/ diseases-conditions/sacroiliitis/home/ovc-20166357 (last updated Aug. 4, 2017). Sacroiliitis can cause pain in the lower back extending down one or both legs. Id. Prolonged standing or stair climbing can worsen the pain. Id.

ray of Plaintiff's "lumbar spine demonstrate[d] mild degenerative disc disease at the L5-S1 junction." (AR 675.) Dr. Keller opined that Plaintiff was "able to lift and carry 50 pounds occasionally and 25 pounds frequently," "push and pull on a frequent basis," "walk and stand six hours out of an eight-hour day," "walk on uneven terrain, climb ladders, and work at heights frequently," "sit six hours out of an eight-hour day," and "bend, crouch, stoop, and crawl frequently." (AR 675-76.) He also found "no limitations for fingering, handling, feeling, and reaching." (AR 676.)

Plaintiff and her husband filled out function reports on November 20, 2012.[15] (AR 174-92.) Plaintiff wrote that she "can't stand or walk for a long time or sit down because [she] . . . get[s] shrap [sic] pains in the back and down [her] leg." (AR 184.) Her husband stated that "she doesn't understand instructions . . . well and she can't bend or squat[] and if she try's [sic] to it ends up hurting her after really bad." (AR 174.) He added that "she can't take her medication in the day time because it make[s] her sleepy and can't function so she takes it at night time and she is in really bad pain by that time." (Id.) She left her house during the week to take her daughter to school and did not go outside on the weekends. (AR 187.) Other than that, the only errand she ran — usually accompanied by someone — was going to the market about two or three times a month. (AR 177, 187.) During the day, she cleaned

---

[15] The ALJ mentioned Plaintiff's husband's function report only in passing (AR 21) and did not expressly discredit it.

17

and did laundry; it took her "all day" to clean, and she did the laundry "once a week with help." (AR 175, 186.) She cooked dinner in the evenings, though sometimes her husband would do the cooking. (AR 176, 186.) It took her 30 minutes to an hour to cook dinner, and she had to "seat [sic] down often" during that time. (Id.)

At her October 27, 2014 hearing, Plaintiff testified that her daughter, mother-in-law, and sister-in-law "help[ed]" her "do the cleaning [and] . . . the cooking" because she was "in bed all day." (AR 43.) They also "help[ed] [her] go to the rest room." (Id.) She rarely drove herself anywhere and usually relied on her sister-in-law to accompany her to doctor's appointments or go to the market. (See AR 43-44.) Her doctors had prescribed numerous medications to treat her pain, and she was waiting for insurance authorization for aquatherapy, physical therapy, and pain-management treatment. (AR 46-48, 55, 61-62.)

3. Analysis

The ALJ found that Plaintiff had severe impairments of "fibromyalgia, rheumatoid arthritis, headaches, tendonitis of the left wrist, left arm tremor, peripheral neuropathy, degenerative changes in the lumbar spine and disc herniation, lumbar and cervical radiculopathy, cervical strain, tricompartmental osteoarthritis of the left knee, hyperlipidemia, and obesity" and was capable of performing "less than the full range of 'light' work." (AR 19, 23.) In so finding, he considered but did not give "any weight" to the "medical source statements from treating physicians, Drs. Calleros and Romano," which assessed Plaintiff "as capable of less than sedentary work." (AR 23-24.) Because

Drs. Calleros's and Romano's opinions were contradicted by other medical opinions in the record, the ALJ had to give only specific and legitimate reasons for discounting all or part of them.  See Carmickle, 533 F.3d at 1164.  As discussed below, though the ALJ did so for Dr. Romano's opinion, he did not for Dr. Calleros's.

The ALJ gave identical reasons for rejecting the two treating physicians' opinions.  As to Dr. Romano's opinion, those reasons were specific, legitimate, and supported by substantial evidence in the record.  The ALJ noted that the "record fails to support such extensive work limitations," and he found "little evidence in support of a less than sedentary residual functional capacity."  (AR 24.)

Dr. Romano's brief relationship with Plaintiff and his contradictory treatment notes provided substantial evidence for rejecting his opinion.  Dr. Romano saw Plaintiff twice before filling out the medical-source statement.  (AR 662-65.)  Nothing indicates that he reviewed any of her medical records.  (See generally id.)  His treatment notes for both visits show that Plaintiff exhibited "normal gait; grossly normal tone and muscle strength; full, painless range of motion of all major muscle groups and joints[; and] no masses, effusions, misalignment, crepitus, or tenderness in major joints."  (AR 664-65.)  She exhibited no other symptoms of any kind.  (See generally AR 662-65.)  Despite these observations, however, Dr. Romano checked boxes on the medical-source statement explicitly contradicting his treatment notes.  For example, though his notes state that Plaintiff had "full, painless range of motion of all major muscle groups," he checked that she had an "inability to ambulate" or

19

"perform fine and gross movements effectively." (<u>Compare</u> AR 664-65, <u>with</u> AR 666.) Moreover, the extreme limitations Dr. Romano assessed were not supported by any of his examination findings. (<u>See generally</u> AR 662-65.) The brief explanation Dr. Romano provided in the comments section of the form stated little more than his diagnoses of "Rheumatoid Arthritis" and "Fibromyalgia" and his opinion that "[b]oth conditions are disabling . . . [patient] not capable of any gainful employment." (AR 669.) The ALJ properly rejected Dr. Romano's assessment because it was inconsistent with his own treatment notes, which did not support the assessed extreme limitations.[16] (AR 24, 669); <u>see</u> <u>Rollins v. Massanari</u>, 261 F.3d 853, 856 (9th Cir. 2001) (ALJ permissibly rejected physician's opinion when it was contradicted by or inconsistent with treatment reports); <u>Connett v. Barnhart</u>, 340 F.3d 871, 875 (9th Cir. 2003) (physician's opinion properly rejected when treatment notes "provide[d] no basis for the functional restrictions he opined should be imposed on

_____

[16] Although the ALJ did not so find, he could also have rejected Dr. Romano's conclusion that Plaintiff's condition was "disabling . . . [causing her to be] incapable of any gainful employment" because it was an opinion on an issue reserved to the Commissioner. Indeed, that statement (AR 669) was essentially an opinion on Plaintiff's ultimate disability status, which the ALJ was not obligated to accept. <u>See</u> § 416.927(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996) (treating-source opinions that person is disabled or unable to work "can never be entitled to controlling weight or given special significance"); <u>see also</u> <u>McLeod v. Astrue</u>, 640 F.3d 881, 885 (9th Cir. 2011) (as amended) ("A disability is an administrative determination of how an impairment, in relation to education, age, technological, economic, and social factors, affects ability to engage in gainful activity.").

[plaintiff]"); see also Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (ALJ need not accept doctor's opinion that "is brief, conclusory, and inadequately supported by clinical findings").

In contrast, the ALJ's reasons for rejecting Dr. Calleros's opinion were not supported by substantial evidence in the record. Dr. Calleros's opinion was based on extensive treatment notes showing Plaintiff's complaints of pain and associated diagnoses as well as the results of his physical examinations of her. Dr. Calleros saw Plaintiff regularly over the course of almost two years, and the medical-source statement he filled out is consistent with the objective observations and physical exams of Plaintiff reflected in his treatment notes. (Compare, e.g., AR 631 (neurological physical exam showing "tremors"), with AR 670 (report checking "Neuro-anatomic distribution of pain").) These complaints and medical issues are also reflected throughout the record.

In rejecting the doctors' opinions, the ALJ noted that Plaintiff's "history of treatment for lumbar spine and other musculoskeletal problems has been intermittent and sparse." (AR 24.) This assertion is not supported by the record. Plaintiff's complaints of pain date back as early as 2004. (See AR 240 (Sept. 21, 2004 referral to USC Pain Clinic for back pain).) She began consistently complaining of and seeking treatment for back pain in 2008 with her primary-care physician at the time, Dr. Rodolfo Arevalo. (See, e.g., AR 299-301 (Aug. 15, 2008: reporting worsening lower-back pain with spine "positive for posterior tenderness"), 304 (Nov. 17, 2008: persistent back pain

21

"[n]ot improving"), 311 (Oct. 19, 2009: lower-back pain "worsening"), 323 (June 28, 2010: lower-back pain "has radiated to the left calf and left thigh," described as "burning, deep, discomforting and shooting"), 329-30 (Mar. 14, 2011: reporting left-arm numbness and positive for back pain), 333 (Sept. 16, 2011: "severe" symptoms occurring "daily," "limiting house work, pain pills not working"), 346 (Apr. 23, 2012: positive for back pain, joint pain, joint swelling, and neck pain).) By the time she first saw Dr. Calleros, in October 2012, Dr. Arevalo had already prescribed Plaintiff Flexeril,[17] Vicodin,[18] tramadol,[19] gabapentin, and Toradol[20] to treat her back pain. (AR 301, 316, 325, 335.) Dr. Calleros also prescribed Norco, diclofenac, prednisone, primidone, Percocet, and Robaxin to treat her pain. (AR 487, 629, 631, 634, 651.)

The ALJ further stated that "[d]espite [Plaintiff's] complaints of significant pain, she has not provided a cogent answer for why her treatment has been so limited." (AR 24.) He cites as support her "apparent[] declin[ing]" of pain-management

[17] Flexeril is a muscle relaxant used to treat such skeletal muscle conditions as pain and injury. See Flexeril, Drugs.com, https://www.drugs.com/flexeril.html (last updated Apr. 12, 2009).

[18] Vicodin is an opioid pain medication used for the relief of moderate to moderately severe pain. See Vicodin, Drugs.com, https://www.drugs.com/vicodin.html (last updated Sept. 29, 2016).

[19] Tramadol is a narcoticlike pain reliever used to treat moderate to severe pain. See Tramadol, Drugs.com, https://www.drugs.com/tramadol.html (last updated July 2, 2017).

[20] Toradol is a nonsteroidal antiinflammatory drug used to treat moderate to severe pain. See Toradol, Drugs.com, https://www.drugs.com/toradol.html (last updated July 22, 2016).

22

treatment and "fail[ure] to properly follow-up" on physical therapy. (Id.) Yet to the extent there were any gaps in treatment, Plaintiff did provide a reason: insurance change. (AR 46-47.) She testified that she had "to wait for [insurance] authorization" for her physical therapy, her primary doctor had to resubmit for authorization for pain management because of "insurance changes," and she was "waiting for the authorization" for treatment for her fibromyalgia and rheumatoid arthritis.[21] (AR 46-47, 49.) The record documents Plaintiff's insurance struggles, suggesting legitimate difficulty obtaining authorization from her insurance in a timely manner. Though at one point she "received authorization for the pain management doctor" (AR 544 (Dec. 13, 2013)) and was "waiting to see pain management" (AR 635 (Jan. 2, 2014)), her "insurance changed" so she had to resubmit "the papers to the new insurance and then wait for authorization" to get her appointment (AR 224 (Feb. 18, 2014)). Treatment notes from Plaintiff's last physical-therapy appointment show she couldn't attend more sessions "until [she] receive[d] more authorized visits." (AR 581.) The discharge summary from her physical therapist also confirms the need for

[21] The ALJ also states that "[w]hile [Plaintiff] has been given diagnoses of rheumatoid arthritis and fibromyalgia, there is no evidence that she has undergone significant evaluation or treatment for such conditions." (AR 24.) Dr. Meir referred Plaintiff to a rheumatologist on April 8, 2014. (AR 658-59.) Dr. Romano diagnosed Plaintiff with fibromyalgia and rheumatoid arthritis on October 2, 2014 (AR 664), only three weeks before her October 27 hearing (AR 39). His February 26, 2015 decision was less than five months after her diagnosis, giving her little time to establish "significant evaluation or treatment for such conditions," particularly given her insurance issues.

23

further authorization. (AR 576.) Plaintiff averred to this at her hearing, testifying that she "didn't make follow-up appointments" because "they changed [her] insurance" and her "doctor would have to resubmit it to the new insurance." (AR 61-62.) Failure to seek treatment because of insurance issues is not a specific or legitimate reason to discount a treating physician's opinion. See Folsom v. Colvin, No. ED CV 16-291-PLA, 2016 WL 6991194, at *9 (C.D. Cal. Nov. 29, 2016). Indeed, insurance issues are a valid reason for limited treatment, see Quinones v. Colvin, No. CV 12-3017 AN, 2013 WL 990767, at *6 (C.D. Cal. Mar. 13, 2013); Napier v. Colvin, No. EDCV 14-1886-KLS, 2015 WL 6159464, at *4 (C.D. Cal. Oct. 20, 2015) (plaintiff's failure to pursue epidural injections or pain-management program while waiting for insurance approval not proper basis for discrediting her subjective symptom testimony); see also Smolen, 80 F.3d at 1284 (Plaintiff "had not sought treatment" because "she had no insurance and could not afford treatment"); Orn v. Astrue, 495 F.3d 625, 638 (9th Cir. 2007) (holding that benefits cannot be denied when Plaintiff's failure to obtain treatment arises from lack of medical insurance), and there is substantial evidence in the record showing that any gaps in treatment for her back pain stemmed from issues with insurance authorization.

Further, the ALJ stated that Plaintiff's "treatment has consisted of no more than very conservative care, including pain medications, muscle relaxants, hot packs, home exercises, and some physical therapy." (AR 24.) Plaintiff's pain-management regimen cannot properly be categorized as "very conservative,"

however.  *See* <u>Soltero De Rodriguez v. Colvin</u>, No. CV 14-05765-RAO, 2015 WL 5545038, at *4 (C.D. Cal. Sept. 18, 2015) (management of pain through medicine, NMS/TENS unit, and spinal injections not conservative).  Unlike conservative over-the-counter pain medication, "the use of narcotic medication in conjunction with other treatments is generally viewed as non-conservative treatment." <u>Id.</u>  Plaintiff's medical conditions were treated with prescription narcotic opioid, antiepileptic, barbiturate anticonvulsant, muscle-relaxant, and antiinflammatory pain medications.  (<u>See, e.g.</u>, AR 301, 316, 325, 335, 487, 629, 631, 634, 651.)  She also received physical therapy and aquatherapy, was prescribed a TENS unit for home use, and was awaiting insurance authorization for more intensive pain-management treatment.  (<u>See</u> AR 47, 541.)  Though the narcotic pain medications helped relieve some of her pain, Plaintiff did not take to them well.  (<u>See, e.g.</u>, AR 630 (complaining that "Norco gave insomnia"), 633 (complaining that Percocet caused mania).)  Her husband reported in his function report that "she can't take her medication in the day time because it make[s] her sleepy and can't function so she takes it at night time and she is in really bad pain by that time." (AR 174.)  This serious pain medication, in conjunction with her therapies and Dr. Galloni's referral for further treatment, cannot be characterized as conservative.  <u>See</u> <u>Lapeirre-Gutt v. Astrue</u>, 382 F. App'x 662, 664 (9th Cir. 2010) (holding "copious amounts of narcotic pain medication as well as occipital nerve blocks and trigger point injections" not conservative); <u>Huerta v. Astrue</u>, No. EDCV 07-1617-RC, 2009 WL 2241797, at *4 (C.D. Cal. July 22, 2009)

25

(treatment of narcotic pain medications, including Vicodin and Robaxin, epidural steroid injections, and neck surgery not conservative).

Though Dr. Galloni described Plaintiff's physical therapy without spine surgery as "conservative" (AR 544), Plaintiff did not need to undergo "the most aggressive available" treatment, see Christie v. Astrue, No. CV 10-3448-PJW, 2011 WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011) (narcotic pain medication, injections, epidural shots, and cervical traction not categorized as conservative despite no surgery). Moreover, as described above, Plaintiff had been prescribed more aggressive treatment, such as epidurals, but did not yet have the insurance to cover it. This delay in pursuing more intensive pain management was caused by circumstances outside her control and should not be viewed as a failure to seek treatment. See Orn, 495 F.3d at 638.

Finally, the ALJ noted that "physical therapy helped to increase her mobility and allowed her to perform her activities of daily living, inconsistent with her hearing testimony that she mostly lies around all day." (AR 24.) Even assuming she had improved by the time of the ALJ's decision, he did not explain how any "increase[d] . . . mobility" and ability "to perform her activities of daily living" (id.) would "translate to an ability to [perform] work activities," see Soltero De Rodriguez, 2015 WL 5545038, at *4; see also Trevizo v. Berryhill, __ F.3d __, No. 15-16277, 2017 WL 4053751, at *12 (9th Cir. Sept. 14, 2017) (as amended) ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."

26

(citation omitted)).  "[I]mpairments that . . . preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day."  Garrison v. Colvin, 759 F.3d 995, 1016 (9th Cir. 2014) (citation omitted) (holding that "ability to talk on the phone, prepare meals once or twice a day, occasionally clean one's room, and . . . care for one's daughter, all while taking frequent hours-long rests, avoiding any heavy lifting, and lying in bed" was "consistent with an inability to function in a workplace environment").  "[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."  Reddick, 157 F.3d at 722 (citations omitted).

Because the ALJ failed to provide a specific and legitimate reason for giving no weight to Dr. Calleros's opinion, remand is warranted.

B.  Remaining Issues

Plaintiff asserts that the ALJ erred in assessing her credibility.  (J. Stip. at 10-12, 16-20, 21-25, 27-28, 29-30, 32.)  The ALJ may have to reevaluate Plaintiff's statements' credibility after he reassesses Dr. Calleros's opinion, so the Court does not address those arguments.  See Negrette v. Astrue, No. EDCV 08-0737 RNB, 2009 WL 2208088, at *2 (C.D. Cal. July 21, 2009) (finding it unnecessary to address further disputed issues when court found that ALJ failed to properly consider treating doctor's opinion and laywitness testimony).

C.   Remand for Further Proceedings Is Appropriate

Plaintiff contends that "the ALJ's failure to credit Plaintiff's treating physicians means those opinions must be credited as a matter of law." (J. Stip. at 32.)  But that is not always the case.  When, as here, an ALJ errs, the Court generally has discretion to remand for further proceedings.  See Harman v. Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000) (as amended); Connett, 340 F.3d at 876 ("credit as true" doctrine is not mandatory).  When no useful purpose would be served by further administrative proceedings, however, or when the record has been fully developed, it is appropriate under the "credit as true" rule to direct an immediate award of benefits.  See Harman, 211 F.3d at 1179 (noting that "the decision of whether to remand for further proceedings turns upon the likely utility of such proceedings"); Garrison, 759 F.3d at 1019-20.

Here, further administrative proceedings would serve the useful purpose of allowing the ALJ to reassess Dr. Calleros's opinion, and if he again finds that it is deserving of no weight, provide a specific and legitimate reason for that finding.  He may also reassess his evaluation of the credibility of Plaintiff's symptom statements and reevaluate Plaintiff's RFC in light of the evidence he did not previously consider or did not adequately explain his consideration of.  Thus, remand is appropriate.  See Garrison, 759 F.3d at 1020 n.26.

## VI.  CONCLUSION

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[22] IT IS ORDERED that judgment be entered REVERSING the Commissioner's decision, GRANTING Plaintiff's request for remand, and REMANDING this action for further proceedings consistent with this memorandum decision.

DATED: 10/06/2017          JEAN ROSENBLUTH
                           JEAN ROSENBLUTH
                           U.S. Magistrate Judge

---

[22] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."